Filed 10/23/14  P. v. Lowe CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>JAMES IRA LOWE,<br><br>     Defendant and Appellant. | F066248<br><br>(Super. Ct. No. F11903239)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jane A. Cardoza, Judge.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant James Ira Lowe was convicted of first degree burglary (Pen. Code,[1] §§ 459 & 460, subd. (a); count 1), robbery (§ 211; count 2), possession of a firearm by a felon (§ 12021, subd. (a)(1);[2] count 3), grand theft of a firearm (§ 487, subd. (d); count 4), assault with a semiautomatic firearm (§ 245, subd. (b); count 5), and assault with a deadly weapon (§ 245, subd. (a)(1); count 6). The jury found that he personally used a firearm in connection with count 2 (§ 12022.53, subd. (b)) and count 5 (§ 12022.5, subd. (a)). Defendant also admitted that he previously was convicted of a serious felony (§ 667, subd. (a)) and served four separate prison terms (§ 667.5, subd. (b)). He was sentenced to 40 years eight months in prison[3] and ordered to pay the maximum restitution fine of $10,000, inter alia.

On appeal, defendant contends that the trial court erroneously (1) refused to give requested jury instructions on unconsciousness and involuntary intoxication, (2) sustained the prosecutor's relevance objection to a question about whether his prescription medications could cause somnambulism, (3) restrained him via silent tether during trial, and (4) imposed the maximum restitution fine. In affirming the judgment, we conclude that (1) the court properly refused to give the requested instructions; (2) the court's

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2]     Effective January 1, 2011, and operative January 1, 2012, section 12021, subdivision (a), was repealed and reenacted without substantive change as section 29800, subdivision (a).  (Cal. Law Revision Com. com., West Ann. Pen. Code (2012 ed.) foll. § 29800, p. 194.)

[3]     The trial court imposed (1) the doubled upper term of 18 years plus a 10-year enhancement for personal firearm use, a five-year enhancement for the earlier felony conviction, and three 1-year enhancements for three prior prison terms, amounting to 36 years, on count 5; (2) two years eight months—one-third of the doubled middle term—on count 1, to be served consecutively; (3) two years—one-third of the doubled middle term—on count 6, to be served consecutively; and (4) the doubled upper term of six years on count 3, to be served concurrently.  The court stayed execution of punishment on the remaining counts.

2.

erroneous ruling on the relevance objection did not result in a miscarriage of justice; (3) the defendant forfeited his unnecessary restraint claim; and (4) the court did not abuse its discretion when it imposed the maximum restitution fine.

## STATEMENT OF FACTS

### I. Prosecution Case-in-Chief.

On June 3, 2011, sometime after 1:00 p.m., Edward Wade, Jr., returned to his apartment at 5212 North Valentine Avenue, located on the northeast corner of North Valentine Avenue and West San Jose Avenue in Fresno, California. He noticed that the front door, which he had closed and locked in the morning, no longer had a deadbolt and was slightly ajar. In addition, "a lot of metal shavings" were on top of the doormat. As Wade started to enter the premises, "[t]he door flew open" and he "heard a scream[,] like a battle cry." Soon after, he and defendant collided "like football linemen" and ended up fighting on the ground outside. Wade testified that he did not know defendant prior to this incident.

During the struggle, Wade saw some of his personal belongings, including a duffel bag and .45-caliber semiautomatic handgun, in defendant's possession. He pinned defendant, headbutted him, and said, "You took my stuff." Defendant replied, "You don't deserve it." Wade also remarked, "You've got my gun." Defendant answered, "Yeah, I've got your gun." At one point, defendant told Wade, "If you let me go, I won't take your things." Wade testified that defendant was coherent.

When Wade dialed 911 on his cell phone, defendant "became very animated and struggled hard," preventing Wade from speaking to the operator. At around 1:30 p.m., Oscar Rangel, a neighbor, heard Wade "screaming … for help" and observed him and defendant "bleeding and fighting" on the ground. Rangel hurried to his apartment and called 911.[4]

---

[4]     The jury listened to a recording of Rangel's 911 call.

Defendant eventually broke Wade's cell phone and pulled out a four-inch multi-tool blade, compelling Wade to withdraw. As defendant lunged, Wade "backed into the apartment," "used [the front door] as a shield," and searched for a weapon. After he failed to find one, he peeked from behind the door and saw defendant pointing the stolen firearm at him. Wade slammed the door, jumped out of the line of fire, and waited for about one minute. He went back outside and spotted defendant leaving the apartment complex. Wade subsequently called 911 from his home phone.[5]

At approximately 1:34 p.m., Officer Mark Sotelo responded to a call of a burglary, during which the suspect swiped the victim's handgun. He drove northbound on North Valentine Avenue past West San Jose Avenue and encountered defendant, who matched the suspect's description, carrying nylon bags and a backpack and walking southbound on the opposite side of the street. Sotelo executed a U-turn and, using his vehicle's public address system, ordered defendant to raise his hands in the air. Defendant complied. Sotelo exited the vehicle and ordered defendant to lie face down on the ground. Defendant again complied. When Sotelo asked where the firearm was hidden, defendant revealed that "it was in his left front pocket."

Officers John Jensen and Gabriel Ramirez joined Sotelo, detained defendant, and secured the gun. Ramirez searched defendant and found a small pocket knife and the multi-tool. Sotelo testified that defendant, though "nervous," "was very articulate and clear" and did not seem to be either disoriented or intoxicated. Ramirez testified that defendant, who "had blood all over his face," was "[t]ired," "frustrated," and "more concerned about … tending to his injuries," but "appear[ed] to understand" and "respond[ed] appropriately" to questions.

---

[5]  The jury listened to a recording of Wade's 911 call.

Ramirez met with Wade and sorted the items recovered from defendant. Wade claimed the handgun,[6] bags, pocket knife, collector's knife, digital camera, camera case, three bottles of beer, two watches, three sets of keys, sunglasses, and eyeglass case. The backpack, which did not belong to Wade, contained a Phillips screwdriver, flathead screwdrivers, box cutters, needle-nose pliers, wire cutters, and a pipe wrench.[7]

## II.    Defense Case-in-Chief.

At the time of the incident, defendant was prescribed the following drugs: Atripla for human immunodeficiency virus (HIV), Acyclovir and Norco for shingles, Gabapentin for peripheral neuropathy, and Tramadol, Motrin, and Marinol for residual pain from chemotherapy. Excluding Acyclovir and Norco, which he first obtained on June 1, 2011, he used these medications "for quite a while …." For over a one-year period, defendant was "off and on" Atripla because he "didn't like the way it made [him] feel." Moreover, whenever he restarted his Atripla dosage following a layoff, he "felt … drunk for the first … week or so" and "stumbl[ed] around …." Defendant was not advised about Acyclovir's and Norco's side effects, but read the "Do not operate heavy equipment" warning on their bottles' labels.

On June 3, 2011, defendant woke up at about 10:30 or 11:00 a.m. because his mother called to remind him that they were meeting for lunch and shopping for groceries

---

[6]    The record confirms that the firearm was registered to Wade.

[7]    Ramirez testified that these instruments were "burglar tools":

"[Big] [f]lathead screwdrivers are … used to pry … open windows, doors, … you also can use pliers to pull off screens of windows, … the flatheads will get under the screen of a window. You also use some of those items just to break the window. [¶] … [¶] [Y]ou can use the wire cutters … to cut through something. You can use the flathead to pop something open. The box cutter, you can shave around older windows so you can … pop the window open …."

Ramirez added that the tools "could be useful in removing a dead bolt lock."

at around 1:00 p.m. He could not recall whether he took his doses immediately, but "may have" since he normally did so "right as [he] woke up, … on an empty stomach." After he showered, defendant, who "was in a lot of pain," ingested his medications, possibly for a second time.

Defendant needed to repair his shower's mixing valve, but had loaned a backpack containing his pliers, razor knife, socket set, and assorted screwdrivers to a friend.[8] He left his home, located on the corner of East Princeton Avenue and North Wishon Avenue, and went to his friend's residence, located on the corner of North Glenn Avenue and East Simpson Avenue. After he retrieved the backpack, defendant headed to Sears at the Manchester Shopping Center to purchase a pipe wrench and soldering torch, but "d[id]n't remember ever reaching Sears." Instead, he experienced "a dream like recollection of being at the Home Depot," which was "quite a distance" from his house. Next, defendant recalled "tussling" with Wade, speaking to emergency personnel technicians about his shingles, and being transported to a police substation and then to jail. He could not remember anything else, including why he and Wade were fighting, how he received a bloody nose, whether he made statements to Wade or police officers, or how he arrived at Wade's apartment complex.[9] Defendant denied "plan[ning] to go to somebody's apartment and take property."

Dr. Simon Paul, defendant's physician for at least four years and an HIV specialist, detailed the various side effects of defendant's medications. Initial doses of

---

[8] At trial, defendant was shown photographs of the backpack and tools recovered by the police. He recognized the backpack, screwdrivers, box cutters, needle-nose pliers, wire cutters, and multi-tool. Defendant did not remember purchasing the pipe wrench, but acknowledged that it was an item he "would have bought." He also admitted that he "kn[e]w how to take a lock off of a door" using these tools.

[9] Defendant testified that the North Valentine Avenue and West San Jose Avenue intersection was five miles away from his house and he did not have a car or driver's license.

Atripla may cause "vivid dreams [and] nightmares" during sleep and grogginess during waking hours. Acyclovir "[d]oesn't usually" affect memory." Norco, a narcotic pain reliever, can "be sedating" and "affect [one's] speed of … thinking." Tramadol's side effects are similar to Norco's, but weaker. Gabapentin "can affect people's concentration." Marinol, a cannabinoid-based drug that defendant has used for three to four years, "can help with pain[] and … make people cloudy in their thinking." With the exception of Atripla and Acyclovir, these drugs may also "cause periods of blackout." Those experiencing a blackout could still "answer[] questions" and "compl[y] with commands," but "[w]on't remember what they did." Paul noted that ingesting two or more medications at once can amplify side effects and "some people have stronger side effects than others."

Paul could not recall whether defendant complained of any side effects from his current medications. However, about a month before the June 3, 2011, incident, defendant was prescribed Vicodin, which contains the same ingredients as Norco, and did not report any problems. Paul did not expect a patient who used Vicodin for a one-month period and then switches to Norco to experience the latter's side effects. Paul testified that patients can develop a tolerance to narcotic pain medications. Such a patient would need to ingest at least six doses of Norco to sustain a blackout. Paul added that two doses of Norco are "pretty unlikely" to cause a blackout. In addition, those who "take too much Norco" are usually lethargic and "wouldn't be walking around being able to do tasks in a normal manner." In response to the prosecutor's hypothetical questions, Paul opined that an individual who gathers tools, goes to an apartment, removes a dead bolt, enters the premises, takes and conceals the occupant's property, encounters the occupant, engages in a "vigorous" physical altercation, draws weapons, flees with the stolen property, is confronted by police, comprehends and complies with commands, provides reasonable answers to questions, looks awake and alert, and generally acts in a manner appropriate to the circumstances is not experiencing Norco's side effects.

7.

**III. Prosecution Rebuttal.**

At the time of the arrest, defendant had blood on his face. When Ramirez asked about the nature of the bleeding, defendant remarked that the blood "wasn't his" and "was from the guy that head-butted him." Over an hour after he was taken into custody, defendant was apprised of his *Miranda*[10] rights by Ramirez. He understood these rights, agreed to speak to Ramirez anyway, and said, "I only have a brief statement. I had the wrong house, wrong guy. That's my only statement." Defendant did not mention that he had taken medications or that he could not remember what transpired.

## DISCUSSION

**I. The Trial Court Properly Refused To Give Defendant's Requested Jury Instructions On Unconsciousness and Involuntary Intoxication.**

**A. Background.**

Defense counsel requested Judicial Council of California Criminal Jury Instructions (CALCRIM) No. 3427 on involuntary intoxication,[11] reasoning that defendant "need[ed] to continue taking his medication or else there would be some severe health complications." The prosecutor countered that defendant "took the drugs willingly." The court found "no evidence to support giving that instruction."

---

[10]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[11]     CALCRIM No. 3427 reads:

"Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/ [or] mental state) when (he/she) acted. [¶] A person is *involuntarily intoxicated* if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the (force/, [or] duress/, [or] fraud/, [or] trickery of someone else), for whatever purpose [, without any fault on the part of the intoxicated person]." (Italics in original.)

Defense counsel also requested CALCRIM No. 3425 on unconsciousness.[12]  She argued:

> "[U]nconsciousness may be caused by a blackout….  [¶]…[¶]  Dr. Paul did mention that the medication being taken by [defendant] could cause a blackout ….  [Defendant] testified he was not conscious of his actions, and there was no evidence elicited that he knew or should have known that the medication could cause a blackout."

The prosecutor responded:

> "I think that unconsciousness does not apply to voluntary intoxication.  I don't think there's any evidence … of involuntary intoxication in this case.  He took his drugs, the drugs that he's been taking for some time, the drugs that were essentially the same group of drug that he had been taking for a while.  Only one was new, but it was just a stronger version of the drugs he was taking before….  [T]hey have warning labels on them ….  [H]is defense goes to voluntary intoxication, which does not apply to unconsciousness."

The court denied the request.

### B.    Analysis.

"In a criminal trial, the court must give an instruction requested by a party if the instruction correctly states the law and relates to a material question upon which there is

---

[12]    CALCRIM No. 3425 reads:

"The defendant is not guilty of _____ *<insert crime[s]>* if (he/she) acted while unconscious.  Someone is unconscious when he or she is not conscious of his or her actions.  [Someone may be unconscious even though able to move.]  [¶]  Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] _____ *<insert a similar condition>*).  [¶]  [The defense of unconsciousness may not be based on voluntary intoxication.]  [¶]  The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted.  If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious, unless based on all the evidence, you have a reasonable doubt that (he/she) was conscious, in which case you must find (him/her) not guilty."

9.

evidence substantial enough to merit consideration." (*People v. Barajas* (2004) 120 Cal.App.4th 787, 791; see §§ 1093, subd. (f), & 1127.) "Evidence is substantial if a reasonable jury could find the existence of the particular facts underlying the instruction." (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1426; accord *People v. Romo* (1990) 220 Cal.App.3d 514, 517.) "'"In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility [of the witnesses] …. Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. [Citations.]" [Citation.]' [Citation.]" (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) "Even so, the test is not whether *any* evidence is presented, no matter how weak." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.) Where evidence is "'minimal and insubstantial,'" the court need not give the requested instruction. (*People v. Lee*, *supra*, at p. 1426.) Whether a particular instruction should have been given in a case is a predominantly legal question reviewed under the de novo standard. (*People v. Cole* (2004) 33 Cal.4th 1158, 1217; *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

"Unconsciousness, when not voluntarily induced, is a complete defense to a charged crime." (*People v. Rogers* (2006) 39 Cal.4th 826, 887; see § 26, class Four; see also *People v. Babbitt* (1988) 45 Cal.3d 660, 693 [unconsciousness negates elements of voluntariness and intent].) "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.)

We conclude that an unconsciousness instruction was not supported by substantial evidence. The record reflects that on June 3, 2011, defendant arrived at Wade's apartment in the middle of the day with a backpack containing a Phillips screwdriver, flathead screwdrivers, box cutters, needle-nose pliers, wire cutters, and a pipe wrench. Utilizing these tools, he removed the front door's deadbolt. Inside Wade's residence,

10.

defendant collected the .45-caliber semiautomatic handgun, nylon bags, knives, digital camera, camera case, beer, watches, keys, sunglasses, and eyeglass case, placing most of the items in the aforementioned bags. When Wade returned unexpectedly, defendant, with goods in tow, tried to run past him. Instead, the two collided and fought on the ground outside. During the altercation, defendant admitted that he took Wade's personal belongings and tried to persuade Wade to release him in exchange for the stolen property. However, when Wade attempted to call 911 on his cell phone, defendant thwarted the call, broke the phone, and tried to stab Wade with a multi-tool blade. After Wade retreated into his apartment, defendant pulled out the handgun and aimed it at Wade. Once Wade vanished from view, defendant fled the scene.

When the defendant was confronted by Officer Sotelo, he not only obeyed commands to raise his arms in the air and lie face down on the ground, but responded truthfully to Sotelo's query as to the whereabouts of the firearm. Defendant also answered Officer Ramirez's question about the blood on his face, specifying that it belonged to "the guy that head-butted him." Finally, following a *Miranda* warning, he confessed, "I had the wrong house, wrong guy." (Cf. *People v. Carlson* (2011) 200 Cal.App.4th 695, 704 (*Carlson*).) The "complicated and purposive nature of [defendant's] conduct" (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 418), "plus the observations of witnesses who interacted with h[im]" (*Carlson*, *supra*, at p. 704; see *People v. Nihell* (1904) 144 Cal. 200, 202 ["[Individuals] are presumed to be conscious when they act as if they were conscious …."]), indicated that defendant "engaged in more than mere physical movement, thereby dispelling any reliance on an unconsciousness theory" (*Carlson*, *supra*, at p. 704).

Defendant maintains that an unconsciousness instruction was warranted on the basis of his and Dr. Paul's testimonies. We disagree. First, Paul testified that ingestion of certain medications, namely Norco, may cause a blackout. Nonetheless, he suggested that defendant was *not* unconscious as a result of these drugs at the time of the June 3,

11.

2011, incident. Paul pointed out that defendant was previously prescribed Vicodin, which contains the same ingredients as Norco, and did not report any side effects. He opined that a similarly-situated patient would need to ingest at least six doses of Norco— three times the amount defendant purported to take on the morning of the incident— before he or she could sustain a blackout. Paul also opined that a person who uses tools to remove the deadbolt of an apartment's front door, takes the occupant's personal belongings inside, encounters and fights the occupant, wields weapons, flees with the stolen property, obeys a police officer's commands, answers police officers' questions, and appears awake and alert is not experiencing a Norco-induced blackout. Second, although defendant testified that he could not remember what occurred between his "dream like recollection of being at the Home Depot" and his "tussling" with Wade, such testimony "standing alone" and "without more" constitutes minimal and insubstantial evidence. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 888; accord *People v. Coston* (1947) 82 Cal.App.2d 23, 40; see *People v. Heffington* (1973) 32 Cal.App.3d 1, 10 [no "ineluctable" rule that a defendant's inability to remember or hazy recollection supplies an evidentiary foundation for a jury instruction on unconsciousness].)

We also conclude that the court properly refused to give an involuntary intoxication instruction. The purpose of this instruction would have been to establish involuntary intoxication as the source of defendant's unconsciousness on June 3, 2011. (See *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1313 ["[I]nvoluntary intoxication that results in unconsciousness is a complete defense to a crime."].) In view of the minimal and insubstantial evidence supporting defendant's claim of unconsciousness, however, such an instruction became gratuitous.

12.

**II.** **The Trial Court's Erroneous Ruling on the Prosecutor's Relevance Objection to a Question About Whether Defendant's Prescription Medications Could Cause Somnambulism Did Not Result in a Miscarriage Of Justice.**

### A. Background.

On redirect examination of Paul, defense counsel asked, "Do any of these medications ever cause any sort of sleep walking activity?" The prosecutor raised a relevance objection as Paul stated, "Not --." The court asked defense counsel if she wished to be heard. She replied, "No." Thereafter, the court sustained the objection.

### B. Analysis.

"Generally, 'all relevant evidence is admissible.'" (*People v. Cottone* (2013) 57 Cal.4th 269, 283, quoting Evid. Code, § 351.) "'Relevant evidence' means evidence … having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see *People v. Wilson* (2006) 38 Cal.4th 1237, 1245 ["'"The test of relevance is whether the evidence tends, 'logically, naturally, and by reasonable inference' to establish material facts such as identify, intent, or motive."'"].)

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that … [¶] [t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).)

We find that the court erroneously sustained the prosecutor's relevance objection. At trial, defendant testified that he could not recall the June 3, 2011, incident in its entirety. He subsequently produced Dr. Paul as an expert witness to establish that he was rendered unconscious by prescription medications. On direct examination, Paul attested that some of defendant's medications could trigger blackouts. Thus, by the time defense

counsel asked Paul whether these same medications could also bring about somnambulism, the court had been made aware of defendant's unconsciousness defense. It should have overruled the prosecutor's objection because the contested question, which concerned the exact mechanism of drug-induced unconsciousness, was germane. (See *People v. Mathson*, *supra*, 210 Cal.App.4th at p. 1315; *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1083 ["An unconscious act, as defined 'within the contemplation of the Penal Code is one committed by a person who because of somnambulism … or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.'"].)[13]

By constitutional mandate, "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of … the improper admission or rejection of evidence, … unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; accord Evid. Code, § 354, subd. (a).) "'[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Clifton v. Ulis* (1976) 17 Cal.3d 99, 105-106, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836; accord *People v. Callahan* (1999) 74 Cal.App.4th 356, 363.)

We conclude that the court's ruling on the relevance objection, though erroneous, did not result in a miscarriage of justice. Even if the court had overruled the objection and Paul had testified that defendant's medications could cause sleepwalking, it was not reasonably probable that defendant would have received a more favorable verdict. The

---

**13** Since the relevance of the excluded question had been disclosed by the form of the question itself and defendant's and Paul's testimonies, an offer of proof was unnecessary. (See *People v. McGee* (1947) 31 Cal.2d 229, 242.)

14.

testimonies of Wade, Sotelo, Ramirez, and even Paul established that defendant was not unconscious during the June 3, 2011, incident.

## III.  The Defendant Forfeited His Unnecessary Restraint Claim.

### A.  Background.

On March 19, 2012, defense counsel filed a motion in limine requesting an order to "unshackle[] [defendant] at all times while in view of the jury," inter alia.  The matter was discussed at a March 19, 2012, pretrial hearing:

> "THE COURT:  …  [¶] … [¶]  … I will say first of all, … in the presence of the jury the general principle is that the defendant's not going to be restrained or shackled in any way.  And as you know, of course, the court would have to find a manifest need to do so.  I do note, however, and I want to talk about here, the fact that we have a second case that's sent to us along with this trial, which is a pending case, as I looked at it, for a battery on a correctional officer.  So I don't know right now whether the sheriff's department is going to ask for a hearing as to whether the defendant ought to be shackled during the course of the trial in light of that behavior.  [¶]  And I do want to ask, first of all, Deputy Hadley, have you ever h[e]a[r]d anything from the sheriff's department about wanting such a hearing?
>
> "THE BAILIFF:  No.
>
> "THE COURT:  I'll let you talk to them over the course of the afternoon if you think you need to.  All I will say about this subject here, counsel, that sometimes it is the practice of lawyers together with the deputies to agree to some kind of a silent tethering under the table.  That's between you and the deputies.  I'm not ordering any of that.  But that's something that you can do to limit the number of deputies they have in the courtroom pursuant to their policies.  That's just your judgment to make.
>
> "[DEFENSE COUNSEL]:  Typically that is the judgment I do make, Your Honor.  And I'll discuss that with Deputy Hadley when we have a moment.
>
> "THE COURT:  Great.  But other than asking for a formal hearing, especially in light of this other charge, … I'll say I will grant your request.  And that the defendant won't be shackled.  And the court would have to find a manifest need to do so.  All right?
>
> "[DEFENSE COUNSEL]:  Yes, Your Honor."

On May 25, 2012, defense counsel filed another motion in limine requesting an order to "unshackle[] [defendant] at all times while in view of the jury." The matter was discussed at a May 29, 2012, pretrial hearing:

> "[DEFENSE COUNSEL]: [Y]our Honor, I understand it's the Sheriff's deputies policy typically to either keep a silent tether at the defendant's feet and keep his hands and waist unshackled, or they need to have additional staff in the courtroom. I would prefer that he have the silent tether at his feet out of the view of the jury pool rather than have additional deputies in the courtroom.

> "THE COURT: All right. And so, you have no objection to having him silently tethered to the table; is that correct[?]

> "[DEFENSE COUNSEL]: I don't.

> "THE COURT: All right. And so, we'll proceed in that fashion."

On May 30, 2012, following jury selection and preceding presentation of evidence, the court inquired as to the visibility of defendant's silent tether outside of the jury's presence:

> "THE COURT: … First of all, in regards to where the alternate is sitting, … I just want to make sure that the alternate cannot see that your client is restrained to the table. Have you been able to view that?

> "[DEFENSE COUNSEL]: I haven't, but for all practical purposes, the entire jury pool was seated behind my client, and my client was visible to everybody throughout.

> "THE DEFENDANT: They've already seen me, your Honor.

> "[DEFENSE COUNSEL]: And we've been brought in and out of the courtroom without my client, and so, they know that I'm not with my client in the hallway, and … when they got here this morning, they were all packed in front of the door, so I don't know. No, they can't see from here. So, any further visuals will be eliminated.

> "[PROSECUTOR]: I know there is --

> "THE COURT: Well, I'm not sure that anyone from the audience could see.

> "[PROSECUTOR]: I certainly, from sitting, and I invite you to stand up, I don't think you can see anything because of the bar. Even when standing, unless they're zeroing in on his legs, because the tether is down below the table, it is a silent tether, I don't know that anybody can see.

16.

"[DEFENSE COUNSEL]: Okay. Thank you. The alternate seat is fine. Thank you for asking.

"THE COURT: Yes. All right. And so …, … I think we've earlier addressed the issue of not having a restraint versus having additional deputies, and it was my understanding that the defendant and defense counsel opted to not have additional deputies, and so, I'll -- anything that you'd like to put on the record or --

"[DEFENSE COUNSEL]: No, that was our option. That was our decision. [¶] … [¶] If I could, please, your Honor. My client did just mention to me that he would have preferred -- regarding security, it was my request that we use the silent tether instead of having extra deputy staff, and I believe we had discussed that prior to making that decision. [Defendant] is telling me he would have preferred extra deputy staff. I think that that's … a strategic decision for the attorney to make, and I will take full responsibility for making that decision, and that's what I decided, but he wanted me to make that clear.

"THE COURT: Very well. Anything that you'd like to put on the record in that regard …?

"[PROSECUTOR]: No, your Honor. I think that is a strategic decision by Counsel.

"THE COURT: All right. And I accept that as a strategic measure by Counsel, and with that, I'll have Madam Clerk go and have the jury report to the courtroom."

## B. Analysis.

"No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge." (§ 688.) "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291; cf. *People v. Jenkins* (2000) 22 Cal.4th 900, 996 ["Measures such as shackling … are inherently prejudicial and are subject to exacting scrutiny …, but precautions such as the use of additional armed security forces are not, because of 'the wider range of inferences that a juror might reasonably draw from the officers' presence.'"].) Nevertheless, a defendant must object

17.

to the use of physical restraints or the claim will be deemed forfeited on appeal. (*People v. Ward* (2005) 36 Cal.4th 186, 206; *People v. Stankewitz* (1990) 51 Cal.3d 72, 95.)

Here, we find that defendant forfeited his claim. Defense counsel filed a motion against physical restraints. At a pretrial hearing, the court recognized defendant's involvement in a pending case alleging battery of a correctional officer, surmised that law enforcement personnel might request a separate hearing on the matter of restraints, and advised that attorneys sometimes agree to restrain their clients via silent tether in order to reduce the number of deputies in the courtroom. After defense counsel stated that she would speak with the bailiff about a possible arrangement, the court granted her motion, pronouncing that "defendant won't be shackled" without a showing of manifest need. Yet, at a subsequent pretrial hearing on a second motion, defense counsel informed the court that she affirmatively consented to defendant's restraint via silent tether in lieu of additional officers. When the court asked whether she objected to the restraint, she said, "I don't." (See *People v. McWhorter* (2009) 47 Cal.4th 318, 375 ["[A]lthough defense counsel made the request that defendant be unshackled, he thereafter acquiesced in the remedy … and made no further objection, thereby waiving any claim on appeal with respect to the absence of further inquiry into the manifest need for the concealed leg restraints."]; *People v. Majors* (1998) 18 Cal.4th 385, 406 ["'It is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal….' [N]ot only did defendant fail to object to the security measures taken at trial, he affirmatively consented to them."].) In addition, before the trial commenced, defense counsel confirmed her choice on strategic grounds, notwithstanding defendant's apparent preference for extra deputies. (See *People v. Miller* (1990) 50 Cal.3d 954, 1004

[dissatisfaction with a particular security measure does not constitute an express objection].)**14**

## IV. The Trial Court did not Abuse Its Discretion When It Imposed The Maximum $10,000 Restitution Fine.

### A. Background.

At the November 16, 2012, sentencing hearing, the court found that defendant's "current crimes involved great violence, great bodily harm, threat of great bodily harm, and high degree of cruelty and viciousness" and ordered him to pay a $10,000 restitution fine, inter alia. Defense counsel asked the court to stay the fine "in light of the time that [defendant] will be spending in custody." The court denied the request.

### B. Analysis.

"In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (§ 1202.4, subd. (b).)**15** "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012, … and not more than

---

**14** Alternatively, defendant claims ineffective assistance of counsel. (See generally *Strickland v. Washington* (1984) 466 U.S. 668.) We reject his contention. "On direct appeal, a conviction will be reversed for ineffective assistance only if … the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission …." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; see also *People v. Jones* (2003) 29 Cal.4th 1229, 1254 ["'"[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"'"].) The record before us does not affirmatively disclose the lack of a rational tactical purpose: defense counsel's remarks implied that she opted for the silent tether because the presence of additional deputies in the courtroom would have been more detrimental to defendant.

**15** "A defendant's inability to pay shall *not* be considered a compelling and extraordinary reason not to impose a restitution fine." (§ 1202.4, subd. (c), italics added.)

ten thousand dollars ($10,000)." (*Id.*, subd. (b)(1); see *People v. Urbano* (2005) 128 Cal.App.4th 396, 406 ["Within the range authorized by statute, the court has wide discretion in determining the amount."].) "In setting the amount of the fine … in excess of the minimum …, the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime." (§ 1202.4, subd. (d).) "In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine … multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (*Id.*, subd. (b)(2).)

In the instant case, the court determined that defendant's crimes were violent, harmful, cruel, and vicious. The seriousness and gravity of the offenses alone may support the maximum $10,000 restitution fine. (See *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.) Furthermore, under the "permissive formula" set forth in section 1202.4, subdivision (b)(2) (*People v. Urbano*, *supra*, 128 Cal.App.4th at p. 406), a $10,000 fine was merited in view of defendant's total number of felony convictions and 40-year-eight-month sentence.[16] Therefore, we conclude that the court did not abuse its discretion.[17]

---

[16] In fact, in the absence of a statutory cap (see § 1202.4, subd. (b)(1)), defendant's fine would have totaled $58,560.

[17] We note that the court imposed the upper term, inter alia, on count 5. (*Ante*, fn.3; see *People v. McGhee* (1988) 197 Cal.App.3d 710, 717 ["[W]hen the circumstances of a particular case are such that imposition of the upper term of imprisonment for a particular crime is justified, a trial court does not abuse its discretion in imposing the maximum restitution fine provided by law."].)

Defendant contends on appeal that the restitution fine was improper in light of his period of imprisonment, health, and inability to pay.  At the sentencing hearing, however, defense counsel did not oppose the fine.  She simply requested a stay, which was correctly denied.  (See *People v. Woods* (2010) 191 Cal.App.4th 269, 272 ["There is no statutory authority which allows the … restitution fine … to be *stayed*."].)  In the absence of an objection at the hearing, defendant forfeited his argument.  (*People v. Nelson* (2011) 51 Cal.4th 198, 227.)

## **DISPOSITION**

The judgment is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
PEÑA, J.

21.